IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ERIN B. TIMOCH, | ) | CASE NO. 5:25-CV-02222 |
| | ) | |
| Plaintiff, | ) | JUDGE CHRISTOPHER A. BOYKO |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | REUBEN J. SHEPERD |
| FRANK BISIGNANO, | ) | |
| Commissioner of Social Security | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

## I.     Introduction

Plaintiff Erin B. Timoch ("Timoch") seeks judicial review of the final decision of the

Commissioner of Social Security, denying her application for Disability Insurance Benefits

("DIB") under Title II of the Social Security Act. This matter is before me pursuant to 42 U.S.C.

§§ 405(g), 1383(c)(3), and Local Rule 72.2(b). Because the Administrative Law Judge ("ALJ")

applied proper legal standards, I recommend that the Commissioner's final decision denying

Timoch's DIB application be affirmed.

## II.     Procedural History

Timoch protectively filed for filed for DIB on April 10, 2023, alleging a disability onset

date of January 6, 2023. (Tr. 158). The claims were denied initially and on reconsideration. (Tr.

58, 68). Timoch then requested a hearing before an ALJ. (Tr. 94-95). Timoch, represented by

counsel, and a Vocational Expert ("VE") testified before an ALJ on July 25, 2024. (Tr. 32-57).

On August 30, 2024, the ALJ issued a written decision finding Timoch not disabled. (Tr. 14-27).

The Appeals Council denied her request for review on September 2, 2025, making the hearing

1

decision the final decision of the Commissioner. (Tr. 1-6; see 20 C.F.R. §§ 404.955, 404.981).

Timoch timely filed this action on October 17, 2025. (ECF Doc. 1). Timoch argues that:

1. The ALJ violated SSR 00-4p by relying on the obsolete occupation of document preparer and failing to resolve an apparent conflict between the VE's testimony and the DOT, and

2. The ALJ erred at at step five (5) by finding significant numbers of occupations exist under the final RFC.

(ECF Doc. 7, p. 1).

III. **Evidence**

A. **Personal, Educational, and Vocational Evidence**

Timoch was born May 5, 1977. (Tr. 25). She was 45 years old on her alleged onset date, making her a younger individual age 45-49 according to agency regulations. (*Id.*). She has at least a high school education. (*Id.*). She has past relevant work as a nurse, DOT #075.364-010, a skilled job at the medium exertional level. (*Id.*).

B. **Relevant Medical Evidence**

On December 28, 2022, Timoch attended a pre-operative evaluation with Sharon Ware, D.O., in anticipation of lumbar decompression surgery. (Tr. 376-79). Her medical history included cardiomyopathy with an ejection fraction of 33 percent, status-post defibrillator placement; spinal stenosis; and depression. (Tr. 376). Dr. Ware noted her activity was limited to walking indoors, such as around the house, light house work, and self care. (*Id.*). Dr. Ware assessed Timoch with spinal stenosis of lumbar region; degenerative disc disease, lumbar; sacral spondylosis; heart disease; cardiac device in situ; at risk for sudden cardiac death; and primary hypertension. (Tr. 378). Dr. Ware wrote that Timoch had been cleared for surgery by cardiology but deemed her to be "at high-risk for the above procedure." (*Id.*). On January 6, 2023, Timoch underwent an L5-S1 interbody fusion with posterior instrumentation, and an L5-S1 posterolateral

arthrodesis. (Tr. 354). At a follow-up appointment on January 13, 2023, examination notes indicated Timoch was doing "significantly well postoperatively," and Timoch reported significant symptom improvement. (Tr. 346).

Timoch attended a cardiac follow-up appointment with Kimberly Humphreys, APRN, CNP, on February 13, 2023. (Tr. 339). CNP Humphreys noted a history of cardiomyopathy likely secondary to a prior history of myocarditis, ventricular tachycardia with loop recorder implanted in 2012, POTS with syncope, hyperlipidemia, hypertension, GERD, and varicose veins. (*Id.*). Timoch had undergone a defibrillator implantation in November 2022, and reported she was feeling well. (*Id.*). She did, however, indicate that she continued to experience chronic dizziness, fatigue, and shortnes of breath that inhibits her doing most of her activities of daily living. (*Id.*). Timoch added that her condition was limiting her from lifting patients and walking up and down hallways as she was required to do in her work as a nurse. (*Id.*). She was assessed with systolic heart failure, with a current ejection fraction of 34 percent; hyperlipidemia; hypertension; ventricular tachycardia; and POTS syndrome. (Tr. 342).

At a seven week postoperative visit with Sarah Woodrow, M.D., on February 20, 2023, Timoch reported that she continued to do well, but she had developed a "deep pain over the SI joint region on the right." (Tr. 336-37). She denied any leg symptoms or weakness, and reported she was otherwise doing well. (Tr. 337). An x-ray showed her hardware was in good position. (*Id.*).

On March 9, 2023, Timoch attended a follow-up cardiac appointment with Indiresha Iyer, M.D. (Tr. 331-36). She reported episodes of palpitations and lightheadedness that occur every few months and last for a few seconds. (Tr. 332). Timoch stated that she walks on a treadmill at two miles per hour or outside for ten minutes, after which she feels mildly short of breath. (*Id.*).

3

She was assessed with severe nonischemic cardiomyopathy likely secondary to viral myocarditis. (Tr. 335).

At a three moth postoperative follow-up appointment on April 3, 2023, Timoch was doing "quite well," though she did report new SI joint tenderness and lower back stiffness. (Tr. 329). She was referred for physical therapy to address both complaints. (*Id.*). Timoch next attended an appointment with Deborah Plate, D.O., to address her hypertension and left hip pain. (Tr. 322). Dr. Plate noted that her most recent echocardiogram revealed her ejection fraction at 28 percent, and noted that she had experienced difficulty walking down the hall, was fatigued, and had shortness of breath with exertion. (Tr. 323). Dr. Plate assessed Timoch with primary hypertension; prediabetes; hyperlipidemia; fatigue; and chronic insomnia. (Tr, 325-26). That same day she was assessed by Jeffery Peiffer, D.O., with trochanteric bursitis of her right hip, and Dr. Peiffer noted she was scheduled to start physical therapy the following day for her back and hip. (Tr. 322). Timoch was discontinued from physical therapy on May 25, 2023 after four visits, reporting she was pain free at times, although she was in pain that day after lifting multiple 40 pound bags of mulch. (Tr. 751). PT notes indicated she met her goals concerning independence in her home exercise program, performing activities of daily living with minimal pain, increasing range of motion of the lumbar spine and strength in her lower extremities, normal gait, and reciprocal stair negotiation. (*Id.*).

On July 3, 2023, Timoch attended a follow-up rheumatology appointment with Nikita Hedge, M.D., who noted Timoch's medical history of undifferentiated inflammatory arthritis, generalized pain, hypermobility, and degenerative arthritis in the lower lumbar spine. (Tr. 796). Timoch indicated her pain was at 3/10, and mostly in her low back with some pain in her hips and knees. (*Id.*). She reported no swelling, although she did have stiffness for 30 minutes in the

morning. (*Id.*). She had had some relief with lumbar surgery and a cortisone injection in her left hip. (*Id.*). Dr. Hedge described Timoch's arthritis as, "Stable. In Remission."  (Tr. 806).

Timoch presented for a cardiology follow-up with CNP Humphreys on August 24, 2023. (Tr. 924). She reported that she was overall feeling well, and that she has been sleeping better and felt less fatigued. (*Id.*). She endorsed chronic dizziness and very brief heart palpitations. (*Id.*). On October 3, 2023, Timoch underwent a cardiac MRI that revealed her left ventricular systolic function was moderately decreased, and her LVEF was at 36 percent. (Tr. 934-35).

At a one year postoperative visit, Timoch confirmed that her lumbar surgery had significantly reduced her preoperative symptoms. (Tr. 1527). She continued to experience pain over her bilateral SI joint regions, although she had some relief with SI joint injections. (*Id.*). She stated that she starts to feel pressure in her lower back if she stands or walks for 45 minutes, and she will feel a "pulling sensation in the right low back with radiation into the bilateral hip regions." (*Id.*).

Timoch attended a follow-up appointment with Dr. Hedge on April 29, 2024, who noted she had recently been diagnosed with Crohn's disease. (Tr. 1643). She rated her lower back and left hip pain at 4/10, and stated that her recent ultrasound guided cortisone injection had not provided much relief. (*Id.*). She was prescribed gabapentin, baclofen, and plaquenil to treat her arthritis. (*Id.*). Timoch saw Dr. Plate on May 30, 2024, complaining of chronic insomnia and fatigue, cardiomyopathy, weight gain, prediabetes, and inflammatory bowel disease. (Tr, 1565-66). She reported struggling with her mood, as well as joint and hip pain, and stated that she had been told her gait had changed. (Tr. 1566). At a virtual visit with Dr. Plate on June 28, 2024, Timoch reported malaise/fatigue, shortness of breath, palpitations, nausea, back, neck, and joint

pain, dizziness, and weakness. (Tr. 1603). Dr. Plate assessed her with elevated liver enzymes, POTS, dilated cardiomyopathy, and other cardiac arrhythmia. (Tr. 1605).

### C. Medical Opinion Evidence

#### 1. State Agency Reviewing Opinion Evidence

On August 16, 2023, state agency reviewing physician Mehr Siddiqui, M.D., opined that Timoch was capable of occasionally lifting and/or carrying 20 pounds, and frequently capable of lifting and/or carrying 10 pounds; that she could sit for 6 hours in an 8-hour workday, and standing and/or walking for 4 hours; that she could frequently climb ramps and stairs, balance, stoop, kneel, crouch or crawl, but she could never climb ladders, ropes, or scaffolds; and that she must avoid all exposure to unprotected heights. (Tr. 64-65). On December 7, 2023, state agency reviewing physician Indira Jasti, M.D., affirmed Dr. Siddiqui's opinion but added a limitation that Timoch must avoid all exposure to heavy machinery. (Tr. 75-77).

On September 15, 2023, state agency reviewing psychologist Courtney Zeune, Psy.D., found that Timoch had no severe mental impairments. (Tr. 62). She opined that Timoch had mild limitations in the domains of concentration, persistence, and maintaining pace, and adapting and managing oneself. (Tr. 63). State agency reviewing psychologist Kristen Haskins, Psy.D., affirmed that opinion on December 4, 2023. (Tr. 73-74).

#### 2. Consultative Examination

Timoch attended a consultative mental examination with Jinhui Wang, Psy.D., on August 21, 2023. (Tr. 907-12). Timoch reported that she was prescribed Prozac, Wellbutrin, and trazodone to address her mental health, and that her depression had interfered with her past work as a nurse because it affected her ability to concentrate and to create relationships with people. (Tr. 908-09). She stated that her medications were helpful, but that she had not found therapy

beneficial. (Tr. 909). Dr. Wang diagnosed Timoch with unspecified depressive disorder, and opined that if Timoch's depressive symptoms worsened that could interfere with her ability to focus and concentrate. (Tr. 911). Dr. Wang further opined that Timoch's depressive symptoms could lower her frustration tolerance and put her "at a bit of risk for workplace pressure at this time." (Tr. 912).

### 3. Medical Source Statements

On October 31, 2023, CNP Humphreys completed a Congetive Heart Failure Medical Assessment Form, noting that she sees Timoch every six months. (Tr. 965). CNP Humphreys checked boxes indicating that Timoch's signs and symptoms included exertional dyspnea, chronic fatigue, and dizziness, and that her symptoms frequently interfered with her attention and concentration. (*Id.*). She also checked boxes indicating that Timoch would be unable to perform routine, repetitive tasks at a consistent pace; detailed or complicated tasks; meet strict deadlines; perform fast paced tasks (e.g., production line); or be exposed to work hazards, such as heights or moving machinery. (Tr. 965-66). She would also experience drowsiness or sedation as a side effect of her medication. (Tr. 966). CNP Humphreys opined that Timoch could stand for 30 minutes continuously, but less than 2 hours in an 8-hour workday. (*Id.*). She would need more than 10 breaks during an average workday due to chronic fatigue and shortness of breath. (*Id.*). CNP Humphreys further opined that Timoch would be absent more than four days per month. (Tr. 967).

On June 28, 2024, Dr. Plate completed a Medical Opinion Re: Ability to Do Work-Related Activities (Physical) form. (Tr. 1574-76). She wrote that Timoch suffered from impairments including dilated cardiomyopathy, chronic diastolic heart failure, arrhythmia, and autoimmune inflammatory arthritis. (Tr. 1574). Dr. Plate opined that Timoch could occasionally

lift or carry less than 10 pounds; that she could sit, stand or walk less than 2 hours in an 8-hour work day; that she can sit 20 to 30 minutes continuously; that she can stand 10 to 15 minutes continuously; that every 15 minutes she must walk for 10 minutes; that she requires the ability to shift from sitting to standing/walking at will; that she can frequently handle, finger, or feel; that she can occasionally twist, climb stairs, reach, or push/pull; that she can never stoop, crouch, or climb ladders; that she must avoid even moderate exposure to extreme cold or heat, wetness, humidity or hazards; that she must elevate her legs due to heart failure; that she cannot balance or crawl due to POTS, and that she will be absent about 3 times per month and off-task more than 15 percent of the time. (Tr. 1574-76).

**D.    Administrative Hearing Evidence**

Timoch testified before an ALJ on July 25, 2024. (Tr. 37-51). Timoch testified that she lives with her husband who suffers from Huntington's Disease. (Tr. 37). She stated that she is on long-term disability from her job as a nurse, and has not worked since December 29, 2022. (Tr. 38). She underwent back surgery in January 2023. (Tr. 39). She is further prevented from working by her heart condition, including a low ejection fraction, that causes her to feel fatigued. (*Id.*). She gets exhausted from very little activity, she becomes dizzy when she lifts things, and she becomes short of breath with little exertion. (*Id.*). Inflammatory arthritis in her joints also prevents her from bending and lifting, although she has been receiving cortisone injections. (*Id.*). She has had cortisone injections in her right shoulder and left hip, and has had multiple injections in her sacroiliac joint. (*Id.*). She also takes Plaquenil prescribed by her rheumatologist. (Tr. 40).

Timoch testified to ongoing back pain, despite her surgery, and she takes a muscle relaxer and gabapentin to try to address it. (*Id.*). The medications do help, and the pain generally is present at a level of three or four out of ten. (*Id.*). The pain is exacerbated by sitting, standing or

walking for extended periods. (*Id.*). She cannot typically stay in any posture for more than 30 minutes at a time. (Tr. 41).

Timoch reports that a trip to the grocery store will leave her exhausted for the remainder of the day, but she does have the energy to tend to her hygiene and grooming. (*Id.*). She cannot do household chores, and has had to hire a housekeeper and a dog walker. (*Id.*). She does manage the bills and prepares meals, although cooking also tires her out. (Tr. 42). She spends her time listening to music, reading books and shopping on Amazon. (*Id.*). She is no longer able to do landscaping, and chooses not to crochet. (Tr. 43).

Under questioning by her attorney, Timoch testified that she takes Wellbutrin, Prozac, and trazodone for her mental health, and these medications also make her tired. (Tr. 44). She takes Ambien to help her sleep at night. (*Id.*). She naps every day. (*Id.*). Timoch stated that she gets dizzy shifting from sitting to standing due to her POTS. (Tr. 45). She also has inflammatory arthritis, which causes pain in her left hip and right shoulder. (Tr. 46). It is difficult for her to reach in any direction. (*Id.*). She had also recently been diagnosed with Crohn's disease which she treats with diet and medication, but stress increases her symptoms of abdominal cramping and diarrhea. (Tr. 47). She has an implantable device in her heart, and though she does not recall episodes of it going off, sometimes she feels like her heart is stopping. (Tr. 48). Timoch testified that in addition to shortness of breath, she will sometimes have edema in her feet, and she is taking Lasix to treat that. (Tr. 49).

Timoch further testified that she had seen a mental health counselor years ago, but did not feel comfortable talking with strangers. (Tr. 50). She reports that her depression has grown worse due to the deterioration in her husband's disability and her own condition. (Tr. 51).

Once Timoch's testimony concluded VE Gail Klier testified. (Tr. 51-56). VE Klier classified Timoch's past work as Nurse, General Duty, DOT 075.364-010, SVP 7, performed at the medium exertional level. (Tr. 52). For his only hypothetical, the ALJ asked the VE to consider a younger individual with at least a high school education and past work consistent with Timoch's who is limited to a range of sedentary work involving no climbing of ladders, ropes, or scaffolds and occasional climbing of ramps or stairs, banalancing, stooping, kneeling, crouching, or crawling. (*Id.*). The VE opined that this individual was incapable of performing Timoch's past work, but could perform jobs such as a charge account clerk, DOT 205.367-014, SVP 2, sedentary exertiona level, with 921 jobs in the national economy; as a telephone quotation clerk, DOT 237.367-046, SVP 2, sedentary exertional level, with 2,709 jobs in the national economy; and as a document preparer, DOT 249.587-018, SVP 2, sedentary exertional level, with 14,165 jobs in the national economy. (Tr. 52-53).

The VE explained that the job of document preparer has changed since the last update to the DOT, and while it no longer involves microfilming, it now relates to scanning documents. (Tr. 53). The VE added that the number of jobs cited for that position reflects the current state in the national economy. (*Id.*). Under questioning from Timoch's attorney, the VE testified that individuals working as document preparers would likely need to use computers to click on documents, to save them and to name a digital file. (Tr. 54). While the job of document preparer may require lifting boxes of documents, the VE testified that the boxes in this scenario would have to be 10 pounds or less to meet the definition of the sedentary exertional level. (Tr. 54-55). The individual working in this job would have to ensure the accuracy of the document and know where it has been saved. (Tr. 55).

IV.    **Post-Hearing Memorandum**

In her Post-Hearing Memorandum, Timoch argued that the occcupations listed and numbers of jobs available for the ALJ's sole hypothetical totaled less than 20,000 positions, and therefore did not constitute significant numbers. (Tr. 299). In support of this argument, Timoch attached a separate unidentified decision signed by this ALJ, declaring that 30,000 available jobs in the national economy fails to constitute significant numbers. (Tr. 302). Timoch further argued that the occupation of document preparer has not been updated in the DOT since 1986 and a current description would require the inclusion of new tasks, including the performance of scanning, quality control, and digital filing. (Tr. 299). These additional skills would raise the position of document preparer to "at least a semiskilled position," akin to the O*Net Online definition of "Office Clerks – General Occupations (43-9061.00)" which have an SVP range of 4-6. (Tr. 299-300). Timoch contends that this evidence, along with "questionable testimony" by the VE, indicates that the occupation of document preparer does not exist as the VE described, and that the occupations and jobs enumerated by the VE fail to constitute significant numbers. (Tr. 300).

V.    **The ALJ's Decision**

In his decision dated August 30, 2024, the ALJ made the following findings:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2028.

2.    The claimant has not engaged in substantial gainful activity since December 29, 2022, the alleged onset date (20 CFR 404.1571 *et seq.*).

3.    The claimant has the following medical impairments: cardiomyopathy, undifferentiated inflammatory arthritis, and degenerative disc disease of the lumbar spine (20 CFR 404.1520 *et seq.*).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments

11

in 20 CFR Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, 404.1526).

5.     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to performsedentary work as defined in 20 CRF 404.1567(a) except that she can occasionally climb ramps and stairs, but can never climb ladders, ropes, or scaffolds. She can occasionally balance, stoop, kneel, crouch, and crawl. She can have no exposure to hazards such as unprotected heights and dangerous moving machinery.

6.     The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.     The claimant was born on May 5, 1977 and was 45 years old, which is defined as a younger individual age 45-49, on the alleged disability onset date (20 CFR 404.1563).

8.     The claimant has at least a high school education (20 CFR 404.1564).

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404. 1569a).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from December 29, 2022, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 14-26).

## VI.     Law and Analysis

### A.     Standard for Disability

Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits:

1.     whether the claimant is engaged in substantial gainful activity;

12

2.      if not, whether the claimant has a severe impairment or combination of impairments;

3.      if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1;

4.      if not, whether the claimant can perform their past relevant work in light of his RFC; and

5.      if not, whether, based on the claimant's age, education, and work experience, they can perform other work found in the national economy.

20 C.F.R. § 404.1520(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The Commissioner is obligated to produce evidence at Step Five, but the claimant bears the ultimate burden to produce sufficient evidence to prove they are disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a).

**B.      Standard of Review**

This Court reviews the Commissioner's final decision to determine whether it is supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). However, the substantial evidence standard is not a high threshold for sufficiency. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). "It means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.*, quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision cannot be overturned "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Id.* at 476. And "it is not necessary that this court agree with the

13

Commissioner's finding," so long as it meets the substantial evidence standard. *Rogers*, 486 F.3d at 241; *see also Biestek*, 880 F.3d at 783. This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error."). Furthermore, this Court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011). Requiring an accurate and logical bridge ensures that a claimant and the reviewing court will understand the ALJ's reasoning, because "[i]f relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked." *Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012).

## VII.    Discussion

Timoch raises two issues for this Court's review:

1. Whether the ALJ violated SSR 00-4p by relying on the obsolete occupation of document preparer and failing to resolve an apparent discrepancy between the VE's testimony and the DOT.

2. Whether the ALJ erred at Step Five by finding significant numbers of occupations exist under the final RFC.

(ECF Doc. 7, p. 1).

A.      **The ALJ did not err in relying on the VE's testimony regarding the occupation of document preparer.**

Timoch argues that there was a conflict between the VE's testimony and the DOT regarding essential functions of the occupation of document preparer, and, under SSR 00-4p, the ALJ had an affirmative duty to identify and resolve that conflict. (*Id.* at pp. 11-12). Citing *Ensley v. Commissioner of Social Security,* 2022 WL 5287798 (E.D. Tenn. Aug. 10, 2022), Timoch contends that once she challenged the VE's testimony and supported that challenge with evidence, the ALJ was required to do more than simply rely on the VE's experience and purported consistency of the VE's testimony with the DOT. (*Id.* at p. 12). Here, in Timoch's view, the ALJ adopted the VE's testimony without appropriately addressing the conflict raised by the VE's admissions on cross-examination along with the arguments raised in Timoch's Post-Hearing Memeorandum. (*Id.* at p. 13).

The Commissioner retorts that Timoch's claim of an unresolved conflict between the vocational expert's testimony and the DOT is not wholly accurate because the VE testified to how the requirements for a document preparer have changed, and explained how she had resolved the conflict with the original classification of the position in the DOT. (ECF Doc. 8, p. 5). Moreover, the VE explicitly testified that her testimony was "consistent with DOT, but is supplemented with my training, education, and experience in regard to my opinion regarding the document preparer job." (*Id.*; Tr. 53). The Commissioner notes that the position of document preparer was among those contemplated when the Social Security Administration issued Emergency Message ("EM")-24027 disallowing an ALJ's reliance on certain DOT occupations for a disability finding without additional evidence from a VE "supporting the adjudicator's conclusion that, as the occupation is currently performed: its requirements are consistent with the

15

individual's RFC, and it exists in the national economy in numbers that alone, or in combination with work in other cited occupations, are significant." (*Id.* at p. 6). The Commissioner argues that the VE's testimony satisfied this EM. (*Id.*). Finally, while the Commisisoner concedes that the document preparer job, as defined in the DOT, is obsolete, he asserts that the job may still be relied on, if, as here, a VE testifies regarding how the job is currently performed and that the current requirements are consistent with the RFC. (*Id.*).

In her Reply Brief, Timoch claims that because she demonstrated that the document preparer position is obsolete, the ALJ was required to do more than just inquire if the VE's testimony was consistent with the DOT. (ECF Doc. 9, p. 2). Timoch contends that the change in the essential functions of the job required the ALJ to address the discrepancy and evaluate whether the VE's testimony remained reliable and consistent with the DOT, and the VE's assertion that her testimony was supplemented by her experience does not carry that burden. (*Id.* at p. 3). Finally, Timoch argues the Commissioner's reliance on EM-24027 was misplaced as the EM does not permit speculative or unsupported modifications of obsolete jobs. (*Id.*).

At Step Five of the sequential analysis, the burden of proof shifts from the claimant to the Commissioner, who must demonstrate that there are significant numbers of jobs existing in the national economy that the claimant can perform given their RFC. *Ensley v. Comm'r of Soc. Sec.*, No. 3:21-cv-00326, 2022 WL 5287798, at *6 (E.D. Tenn. Aug. 10, 2022). SSR 00-4p provides that the Commissioner takes administrative notice of "reliable job information" available from various governmental and other publications, and advises that the SSA relies "primarily on the DOT . . . information about the requirements of work in the national economy" and that "[o]ccupational evidence provided by a VE or VS generally should be consistent with the occupational information supplied by the DOT." 2000 WL 1898704, at *2. "An ALJ can rely on

16

the testimony of a vocational expert identifying specific jobs available in the economy that an individual with the claimant's limitation(s) could perform as substantial evidence supporting an ALJ's finding that the claimant can perform other work." *Zimmerman v. Conn'r of Soc. Sec.*, No 1: 19CV1233, 2019 WL 4736267, at *6 (N.D. Ohio Sept. 27, 2019). Generally, an ALJ "complies with agency policy by asking whether there is any discrepancy between the VE's opinions and the DOT requirements for the jobs identified. (*Id.*).

In *Moats v. Comm'r of Soc. Sec.,* 42 F.4th 558, 562 (6th Cir. 2022) (citing *Biestek,* 139 S. Ct. at 1155-57), the Sixth Circuit held that "when a qualified vocational expert testifies that a person with the claimant's work experience amd physical limitations could perform a significant number of jobs available in the national economy, the ALJ has a solid basis for denying disability benefits." This is "especially so . . . when the vocational expert is well-credentialed and 'has a history of giving sound testimony about job availability in similar cases." *Id.* (quoting *Biestek*, 139 S. Ct. at 1155).

The the ALJ explained his Step Five finding as follows:

> If the claimant had the residual functional capacity to perform the full range of sedentary work, a finding of "not disabled" would be directed by Medical-Vocational Rule 201.21. However, the claimant's ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations. To determine the extent to which these limitations erode the unskilled sedentary occupational base, the Administrative Law Judge asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity. The vocational expert testified that given all of these factors, the individual would be able to perform the requirements of representative occupations of sedentary, unskilled jobs such as Charge Account Clerk, DOT No. 205.367-014, with approximately 921 such jobs available nationally; Telephone Quotation Clerk, DOT No. 237.367-046, with approximately 2,709 such jobs available nationally; and Document Preparer, DOT No. 249.587-018, with approximately 14,165 such jobs available nationally.
>
> Pursuant to SSR 00-4p, the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles (DOT). The

17

vocational expert explained any variances in the testimony to the extent that it differed from the DOT based on experience and training as a vocational expert. Specifically, the vocational expert explained that the job of Document Preparer continues to exist in significant numbers, but now involves using electronic scanning technology instead of the outdated microfiche methods described in the DOT.

Based on the testimony of the vocational expert, the undersigned concludes that, considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy. A finding of "not disabled" is therefore appropriate under the framework of the above-cited rule.

(Tr. 26).

Further, for additional background, in response to the ALJ's sole hypothetical, and the VE's citation to the position of document preparer as a job that the hypothetical individual could perform, the VE testified:

Your Honor, this is a job that's become controversial, and that's because of the DOT being last updated in the mid-1990's. So, the issue with this job is that microfilming is described as a task that Document Preparer performs. In my opinion that has been, for the most part, eliminated, but just that task. So, the Document Preparer, however, will scan documents instead of do the microfilming. With that said, I believe this job does still exist with that change. And I believe the numbers of 14,165 reflect that the job does exist in the national economy as well. These are examples, Your Honor. There would be some others that fit this hypothetical. And my testimony is consistent with the DOT, but is supplemented with my training, education and experience in regard to my opinion regarding the Document Preparer Job.

(Tr. 53).

In support of her position that the ALJ improperly relied on the document preparer job in finding her not disabled, Timoch points to *Cunningham v. Astrue,* 360 F.App'x 606 (6th Cir. 2010). In *Cunningham*, the court deemed the document preparer job description "potentially vulnerable" as "obsolete" and explained that "common sense dictates that when such [DOT] descriptions appear obsolete, a more recent source of information should be consulted." *Id.* at 615. In the period that followed, several lower courts in this circuit followed *Cunningham* and

18

remanded matters to the ALJ because the vocational expert's reliance on potentially obsolete job descriptions from the DOT raised sufficient doubt whether the ALJ's step five determination was supported by substantial evidence. *See, e.g.*, *Wright v. Berryhill*, No. 4:18-CV-00021, 2019 WL 498855, at *9 (W.D. Ky. Feb. 8, 2019); *Westmoreland v. Berryhill*, No. 3:17-cv-00096, 2018 WL 1522118, at *4 (S.D. Ohio Mar. 28, 2018); *Rollston v. Comm'r of Soc. Sec.*, No. 1:16-CV-168, 2016 WL 6436676, at *4 (W.D. Mich. Nov. 1, 2016).

Other courts, however, declined to follow *Cunningham* and criticized its reasoning. *See, e.g.*, *Kidd v. Berryhill*, No. 5:17-CV-420-REW, 2018 WL 3040894, at *7-10 (E.D. Ky. June 19, 2018); *Montano v. Comm'r of Soc. Sec.*, No. 1:13-cv-70, 2014 WL 585363, at *15 (S.D. Ohio Feb. 14, 2014); *Belew v. Astrue*, No. 2:11-107-DCR, 2012 WL 3027114, at *9-10 (E.D. Ky. July 24, 2012); *see also Webb v. Comm'r of Soc. Sec.*, No. 16-11786, 2017 WL 2312827, at *10 (E.D. Mich. Apr. 25, 2017) (describing the "split" among courts in this circuit "as to whether the job 'surveillance-system monitor' can furnish, on its own, a significant number of jobs in the national economy").

In *O'Neal v. Comm'r of Soc. Sec.*, 799 F.App'x. 313 (6th Cir. 2020), the Sixth Circuit clarified that "the DOT data can establish the existence of jobs in the national economy in significant numbers." *O'Neal* noted that the current regulation governing this inquiry lists the DOT as a source of "reliable job information." 20 C.F.R. § 404.1566(d)(1). Further, in *Kyle v. Comm'r of Soc. Sec.,* 609 F.3d 847, 855 (6th Cir. 2010), published after *Cunningham*, the Court reiterated that an ALJ can rely on the DOT to determine that work exists in the national economy, and can rely on the testimony of a vocational expert, once the ALJ ensures that the evidence does not conflict with the information in the DOT, or obtains a reasonable explanation for any conflict. *See O'Neal,* 799 F.App'x at 317.

19

Consistent with SSA EM-24027, the ALJ elicited additional evidence from the VE supporting his conclusion that the job of document preparer, as it is currently performed, has requirements consistent with the individual's RFC, and, it exists in the national economy in numbers that alone, or in combination with work at other cited occupations, are significant. The VE explained in detail the manner in which the job of document preparer has evolved to the current manner in which it is performed. (Tr. 53). When asked if a hypothetical person with Timoch's same conditions could perform other work, the VE stated that the occupation of document preparer as currently performed was consistent with Timoch's RFC. (Tr. 52-53). The VE further testified that with the current job description, 14,165 document preparer jobs exist in the national economy. (Tr. 53). Thus, the mandates of EM-24027 are met.

Timoch's case diverges from *O'Neal*, however, unlike O'Neal, Timoch subjected the VE to cross-examination concerning the job of document preparer (Tr. 53-55), and filed a Post-Hearing Memorandum challenging the VE's testimony. (Tr. 299). On cross-examination,[1] Timoch elicited testimony that the current description of document preparer requires an individual to be able to use a scanner connected to a computer, to understand how to save a document and name a digital file, and place the file in an appropriate location. (Tr. 54). In her Post-Hearing Memorandum, Timoch argued that according to O*NET, an alternative occupational database, the SVP range for a job that requires these new tasks, the SVP would be 4-6, and the job of document preparer as described would be be "at least a semi-skilled position." (Tr. 300). Timoch wrote that "[t]his updated evidence, along with the questionable testimony by the VE, counsel argues that the occupation of Document Preparer does not exist as testified to,

---

[1] Timoch asked no questions and raised no objections concerning the VE's professional qualifications. (Tr. 52).

and furthers the argument that the occupations and jobs enumerated by the VE fail to constitute significant numbers." (*Id.*).

As a preliminary note, the current regulation governing this inquiry lists the DOT as a source of "reliable job information," but does not list O*NET as a reliable source. 20 CFR § 404.1566(d)(1). Although the United States Department of Labor replaced the DOT with O*NET, *see Dictionary of Occupational Titles (4th Ed., Rev. 1991) — Occupational Group Arrangement*, United States Department of Labor, https://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOT03B.HTM, the Social Security Administration still declines to use O*NET in disability proceedings. *See Benefit Offset National Demonstration*, Social Security Administration, https://www.ssa.gov/disabilityresearch/ois_project_faqs.html. Even if, however, the Court were to accept Timoch's claims, supported by her reference to O*NET, she has still failed to show that an individual with her RFC would be unable to perform the updated document preparer job. Her RFC includes no limitations specific to her mental health, and Timoch has not provided any evidence that would suggest her functional limitations would preclude her ability to meet the essential requirements of the job as the VE described.

Without any evidence to refute the VE's assertion that someone with her RFC would be able to perform the job of document preparer as it currently exists, there is no cause to disturb the ALJ's finding, I therefore do not recommend remand on this basis.

**B.      The ALJ did not err in finding at Step Five (5) that significant number of jobs exist under the RFC.**

The ALJ found Timoch "not disabled" at Step Five of the sequential evaluation on the basis of the VE's testimony that an individual with Timoch's RFC could perform three jobs that collectively have 17,795 positions available in the national economy. (Tr. 26). Timoch argues

21

that 17,795 positions does not constitute "significant numbers," noting that there is no clear threshold for what does. (ECF Doc. 7, p. 16). Timoch cites several cases where substantially more than 17,795 available positions in the national economy were found to not comprise significant numbers, arguing that these examples highlight that the Commissioner's burden is not met by citing cases in isolation, particularly where the ALJ provides little or no analysis of the *Hall* factors.[2] (*Id.* at p. 18).

The Commissioner responds that there is no "magic number" of jobs that determines whether positions exist in significant numbers. (ECF Doc. 8, p. 7). The Commissioner points to several cases where fewer than 17,835[3] positions was upheld as "significant numbers," and contends that this determination requires a fact specific inquiry viewed in the context of each case. (*Id.*). Accordingly, the Commissioner asserts, substantial evidence supports the ALJ's Step Five finding. (*Id.* at p. 8).

After finding that Timoch was incapable of performing her past relevant work, the Commissioner had the burden at Step Five of the sequential evaluation to show she could perform other work "which exists in the national economy." *Swartz v. Comm'r of Soc. Sec.,* No. 3:24-CV-02196, 2025 WL 2676562, at *10 (N.D. Ohio Sept. 18, 2025); *see also* 42 U.S.C. § 423(d)(2)(A). "Congress did not define 'significant' in the Social Security Act. Nor has the Commissioner defined the term by rule." *Moats*, 42 F.4th at 563. Absent guidance, the Sixth Circuit has refused to enumerate a boundary between an insignificant and significant number of jobs and instead the ALJ must make the determination on a case-by-case basis. *Swartz*, 2025 WL 2676562, at *10, (citing *Hall v. Bowen,* 837 F.2d 272, 275 (6th Cir. 1988)).

---

[2] Although Timoch references the "*Hall* factors" several times in her brief, citing to *Hall v. Bowen,* 837 F.2d 272, 275 (6th Cir. 1988) she fails to define or delineate what constitutes thoses factors.
[3] Timoch writes that the total number of positions available for the three jobs cited by the VE totals 17,795, while the Commissioner suggests the total number is 17,835. The correct figure is 17,795.

Here, the ALJ determined there were significant numbers of jobs Timoch could transition to, given her RFC, and cited three examples: 921 charge account clerk positions, 2,709 telephone quotation clerk positions, and 14,165 document preparer positions. (Tr. 26). Timoch cites five instances from within the Sixth Circuit where district courts determined that job figures greater than 17,795 were found to be not significant, and four other cases from outside the Sixth Circuit. (ECF Doc. 7, pp. 17-18). The Commissioner points to two Sixth Circuit cases in particular, *Nejat v. Comm'r of Soc. Sec.*, 359 F.App'x 574, 578-79 (6th Cir. 2009) (2,000 assembly jobs nationwide is a significant number), and *Taskila v. Comm'r of Soc. Sec.*, 819 F.3d 902, 905 (6th Cir. 2016) (6,000 jobs nationally).

Timoch retorts that *Nejat* and *Taskila* conflated regional job numbers with national job numbers, and notes that at least one district court in the Sixth Circuit has found *Najat* and *Taskila* unpersuasive on the basis. (ECF Doc. 9, pp. 4-6 (citing Isaac v. Comm'r of Soc. Sec., No. 2:20-cv-11573, 2021 WL 4770122, at *7 (E.D. Mich. Apr. 29, 2021), *report and recommendation adopted*, No. 20-11573, 2021 WL 4167211 (E.D. Mich. Sept. 14, 2021)). The Sixth Circuit acknowledged the criticism of *Nejat* and *Taskila* in *Norris v. Comm'r of Soc. Sec.*, 139 F.4th 541, 546 (6th Cir. 2025), noting that *Nejat* and *Taskila* remain published panel opinions that have not been overruled by the Supreme Court or the en banc Sixth Circuit. *See id.* Even so, *Norris* held that *Nejat* and *Taskila* do not dictate any one outcome because whether there is a significant number of jobs depends on the "specific facts" of each case. *Id.*

Following *Norris*, it is necessary to "evaluate if the specific facts of [Timoch's] case and the national economy warrant reversal." *Id.* at 547. To show work that is available in significant numbers, the Commissioner may rely on a VE's expert testimony about the number of jobs available within the claimant's capabilities. *Id.* Here, when presented a hypothetical person of

Timoch's age, educational background, and work history, and with Timoch's RFC, the VE opined that the individual could perform the jobs noted above, and at the numbers noted in the national economy. (Tr. 52-53). Based on that testimony, the ALJ concluded that Timoch was "capable of making a successful adjustment that exists in significant numbers in the national economy." (Tr. 26).

Having addressed above the question of the validity of the document preparer position, and the number of jobs under that title cited by the VE, I turn to resolve the question of whether the three jobs here amount to a significant number. So long as substantial evidence supports the conclusion reached by the ALJ, I am required to recommend that the District Court affirm. *Jones,* 336 F.3d at 477. Here, the ALJ properly made a factual determination in his decision, specifically discussing the VE's testimony and the jobs available to someone with Timoch's functional limitations, and concluding she could perform other work that exists in the national economy. (Tr. 25-26). The ALJ confirmed that the VE's testimony was consistent with the DOT, and, where it was not, provided reasonable explanations for the discrepancies. (Tr. 26). Accordingly, the ALJ carried his burden here, and I decline to reccomend remand on this basis.

## VIII.  Recommendation

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend the Commissioner's final decision denying Timoch's application for DIB be affirmed.

Dated: July 31, 2026

Reuben J. Sheperd
United States Magistrate Judge

_____

**OBJECTIONS**

**Objections, Review, and Appeal**

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge. Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C 636(b)(1); Local Rule 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

\*\*\*

Failure to file objection within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendations. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991) Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act." *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, 2 (W.D. Ky. June 15, 2018) quoting *Howard*. The failure to assert specific objections may in rare cases be excused in the interests of justice. *See United States v. Wandashega,* 924 F.3d 868, 878-79 (6th Cir. 2019)